## Nelson James *v.* The State.

### Homicide.

In civil cases it is sufficient if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove; but in criminal cases, in order to a conviction, the evidence must produce moral certainty of guilt, to the exclusion of every other hypothesis.

In both civil and criminal cases a verdict may be founded on circumstances alone; and these often lead to a more satisfactory conclusion than direct evidence.

But although circumstantial evidence in a case of assassination, to justify a conviction of murder, should tend to exclude every other supposition but that of guilt, it need not necessarily be such as to render it *impossible* that any other person besides the defendant could have committed the deed.

Forms of entries in records, which are found contained in all the books of authority on the subject, which are deeply seated in the foundations of the law, and which conduce to safety and certainty, ought not to be disregarded when the life or liberty of a human being is at stake. And it is error to pass sentence of death against a person convicted of murder by the verdict of a jury, without the court first asking the defendant if he has anything to offer why such sentence shall not be pronounced.

On such occasion the prisoner has a right to allege grounds for arrest of judgment, plead a pardon, address the court in his own mitigation, or cast himself on its mercy. This opportunity being denied, is sufficient ground for a reversal of the judgment. 1 Bishop's Cr. Pro , § 865, cited and approved.

*T. Marshall Miller* and *Upton M. Young,* for plaintiff in error.

Legal writers have established the principle, that circumstantial evidence, so seldom of a conclusive nature, is of secondary value, when direct evidence is attainable; by the latter the former is to be tested and measured. It may be assumed as a correct principle, that, if the force of circumstantial evidence in any given case be inferior to that which springs from the *lowest* degree of positive or direct evidence—that is, from the testimony of a single witness—a conviction, certainly in a capital case, will not be sustained. Stark. Ev., 865. With confessions excluded, the defendant stands convicted of murder on circumstantial evidence alone, the legal effect of which

would be far inferior to the testimony of one person present, whom opportunity permitted to witness, directly, the criminal transaction. From the record it could not be affirmed that the circumstantial evidence there presented warrants a conviction in the mind equal to that which the lowest degree of direct evidence would afford.

The circumstances in the case are inconsistent, and do not support the verdict, nor do they exclude every reasonable hypothesis but the one proposed to be established. Nor is this all. The testimony is of a conflicting character. It is evident from both principle and analogy that the law favors the utmost vigilance in the examination of all cases resting purely on circumstantial evidence; nor is the history of criminal jurisprudence, showing so many improper convictions, based on circumstantial evidence alone, wanting in examples tending to support this view. Assuming all to be true which the evidence tends to establish, it is insufficient if some other hypothesis may still be true. Algheri v. State, 25 Miss., 584; 1 Stark. Ev., 572; Cicely v. State, 13 S. & M., 211; McCann v. State, ib., 440. The verdict is not warranted by the evidence. Caleb v. State, 39 Miss., 721; 2 Phil. Ev., 386. Anxiety for the detection of great crimes leads witnesses to exaggeration, and juries to draw rash inferences. Presumptions often arise from circumstances which would not have been noticed but for the accusation itself. Pitts v. State, 43 Miss., 472.

2. The confessions of the prisoner were incompetent, and should have been rejected—they were not voluntary. The circumstances under which a confession is made have much weight in determining its competency. In the case of Cady v. State, 44 Miss., this court said: " Confessions must be voluntary, and not induced by expectation of any advantage held out or promised. 2 East P. C., 659. Confessions induced by means of hope or fear, promises or threats, subsequently made, are presumed to come from the same motives, and are incompetent. Peter v. State, 4 S. & M., 31; 5 Halst., 163; Roscoe Crim. Ev., 30; Simon v. State, 37 Miss., 288; Jordan v. State, 32 Miss., 382; Dick v. State, 30 ib., 593; Serpentine v. State, 1

How., 256. Was the confession free? Let us make an analysis of the testimony. When arrested, and until carried to the body of deceased, defendant asserted his innocence, though the mob constantly accused him of guilt. He had been threatened with death if he did not confess. Two crowds accompanied him to the graveyard—one attempted to take him from the other. They told him it would be better for him to confess. At the burial there was excitement—many colored persons were present; their superstitions were aroused and exerted to obtain a confession—their idea was, that the wound of the dead, touched by a guilty hand, would bleed again. What influence such tests exercised upon the minds of a class entertaining these views is a matter of conjecture—the influence that they *did* exert upon the prisoner, a member of that class, is a matter of evidence. That threats and promises, hopes and fears, with a superstitious influence succeeding, *extorted* the confession, the record demonstrates with almost mathematical precision. The means employed accomplished the result desired. That the confession would not have been made in the absence of the improper influences exerted is evident. The record, studded with facts, supports this conclusion. Subsequent confessions were made soon after, in presence of same parties, and were prompted by same influences. 4 S. & M., 31.

It may be argued that, even if the confessions had been rejected, the circumstantial evidence would still support the verdict. We do not think this is a logical view of the case, for the reason that the jury are supposed to have formed their opinions from the *whole* of the testimony submitted, the confessions included. It could not be affirmed that there would have been a verdict of guilty if the confessions had been rejected by the court below. If the confessions were incompetent, a new trial will be granted, without reference to the strength of the other testimony, and especially would this be true in a capital case resting on purely circumstantial evidence.

4. The prisoner was not asked why judgment of death should not be pronounced.

In all capital cases, where the jury have returned their

verdict guilty, in the presence of the prisoner, he is either immediately, or at a convenient time soon after, asked by the court if he has anything to offer why judgment should not be awarded against him. 4 Blackstone Com., 375; 1 Chit. C. L., 720, 699, 701; 3 Salk., 358; Grady v. State, 11 Ga., 253; 4 Harris (Penn.), 129; 1 Park. Crim. Cases, 474, 476; 2 Hale P. C., 217; Perry v. State, 43 Ala., 21, 24; and cases cited. Bishop's Crim. Pro., § 865. The reason of the rule seems to be founded in natural justice, and upon the right of the defendant to urge, before sentence is pronounced, grounds in arrest of judgment, to plead a pardon, or to address the court and ask for leniency. New trials have been granted upon the statements and explanations of prisoners. They have an absolute right to be heard before sentence in capital cases; and as nothing can be presumed for or against a record except what appears upon its face, the *right* in this case was not accorded.

It has been held in New Jersey that the inquiry mentioned, and the record of it, are necessary in capital cases. West v. State, 2 Zab., 212. In Missouri (State v. Ball, 27 Mo. R., 324) a kindred decision has been made, the court holding that an omission of the inquiry in the record, in a case not capital, is not a fatal error. The logical and legal inference from this view is, that the converse theory would have been entertained had the case in hand been capital. In Pennsylvania the omission has been held to be fatal. 4 Harris, 129. If it be conceded, for the sake of the argument alone, that the defendant had no plea in bar to present, and no ground in arrest of judgment to offer, still his right to address the court, in explanation of his case, remained unimpaired. The reason and spirit of the law in such cases are apparent.

*J. S. Morris*, attorney-general.

I have carefully examined the record and the elaborate argument of counsel for plaintiff in error, and think there is no error in the record, unless it be that it does not show that the prisoner was asked by the court if he had anything to say why sentence of death should not be passed on him. With this exception, if it be one, there is nothing requiring argument, or

admitting of controversy, here. The evidence, it is true, is mostly circumstantial,.and as such, might admit of forensic display before a jury. But the prisoner was ably defended, and the jury properly instructed in the circuit court. I do not controvert any of the legal propositions, or dissent from any of the sentimental abstractions laid down by the prisoner's counsel in respect to the character and value of circumstantial evidence and extra-judicial confessions generally. But it is difficult to find any application for these abstractions in the present case. The law, with suitable instructions as to their duty, commits the fate of the prisoner to the jury selected to try him. The jury has tried him, and their verdict is "guilty." It would not matter if, upon considering the case, this court, on the same evidence, would have found a different verdict. The only question is, Was the verdict of the jury warranted under the evidence? What though the evidence was largely circumstantial; what though there was some sort of partial confession; was the testimony, such as it was, legally sufficient to warrant a conviction? I submit the brief and comprehensive summary of the evidence contained in the transcript as the best argument that can be made. Leave out all confession and all the self-inculpatory statements of the accused, and the verdict must still stand. See Browning v. State, 33 Miss. R., 48; Cicely v. State, 13 S. & M., 211; McCabe v. State, ib., 440.

As to whether it be error that the record does not show that the prisoner was asked if he had aught to say why the death sentence should not be passed on him, I cheerfully submit to this honorable court. In a case of so much moment, I would not deny the accused the smallest privilege accorded to him by the humane principles of the law. If, however, the court should hold that this omission in the record is indeed an error, I submit that even then there will be no occasion for a *venire de novo*, but that all that need be done is to merely set aside the sentence, and let the sentence be made correctly as ought to have been done at first.

PEYTON, C. J.:

At the March term of the circuit court of Warren county,

Nelson James was convicted of the murder of one Jerry Miller, and sentenced by the court to be hung. From this judgment he brings the case here for the revision of this court, and assigns for error:

1. The overruling the defendant's motion for a new trial.

2. The admission of the statement or confession of the defendant as evidence on the trial.

3. Permitting the statement of Ann Miller to go to the jury.

4. That the court erred in not asking the prisoner if he had anything to say why sentence of death should not be pronounced against him.

We shall consider the three first assignments together.

In this case the evidence of guilt, as the record shows, was entirely circumstantial, and whether that was sufficient to sustain the conviction, is the first question to be solved. In civil cases it is sufficient if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove; but in criminal cases, it must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis. In both cases a verdict may be well founded on circumstances alone; and these often lead to a conclusion far more satisfactory than direct evidence can produce. As mathematical certainty is not attainable in such cases, *moral certainty* is all that the law requires; and even direct testimony, it is said, does not afford grounds of belief of a higher nature. Evidence which satisfies the minds of the jury to this extent, constitutes *full proof* of the fact in question before them. This moral certainty is defined by Chief Justice Shaw, in his charge to the jury in the Webster case, to be a certainty that convinces and directs the understanding, and satisfies the reason and judgment of those who are bound to act conscientiously upon it.

Upon a careful examination of the evidence in this case, we think it sufficient to justify the conviction. And although counsel have insisted that the evidence, exclusive of the confessions of the accused, is not sufficient to sustain the conviction, we have not been able to find in this record any confessions of guilt made by the defendant, who, on the contrary, persistently denied having committed the offense.

Jacob Black testified that on Sunday evening after the killing, in company with Gabriel Bowman, he arrested the defendant and took him to Dart's; that another party of several persons came along to take the defendant from him, to carry him before Esquire Ulm; that he finally gave the defendant up to them; they seemed to be very excited; they said if they took him they would make him tell if he killed Jerry Miller; they said they would kill him if he did not tell; one man who made this threat was a constable; this was about dark on Sunday evening; defendant heard the threat; witness was at the burial and saw people take the defendant and put his hand on the dead body, saying you killed him, Nelson, you know you did; Nelson denied all the time when thus accused that he killed Jerry, and said nothing about the shooting; the conduct of these men, though harsh and reprehensible, produced no confession from the defendant of his guilt.

The admission of the statement of Ann Miller as evidence to the jury is assigned for error. This statement was drawn out by way of answer to a question put by the defendant, who asked her "Where were you last night that you let them get my breeches." She said she had gone to her sister-in-law's. He said "that is damnation to me; if it had not been for you, I should not have been in this trouble." If there had been anything in her statement except to give point and meaning to what the defendant said immediately thereafter, it would have been objectionable.

It abundantly appears from the testimony in the case that an unfriendly feeling existed between the defendant and deceased for some time prior to the killing, growing out of the fact that the wife of the deceased was, and had been for some time, living with the defendant.

S. T. Ulm, in his testimony, states that he knew the deceased Jerry Miller and Ann Miller, his wife, and that a feud existed between defendant and deceased about Ann; that some time in the spring, before the killing took place, he heard the defendant say that if the deceased bothered him any more about Ann, he would kill him; that on the preliminary trial before him an old pair of light gray pantaloons were produced, which the defend-

ant said were his; the pants were rolled up wet, and looked as though they had been washed; saw stains on one leg resembling blood.

Alexander Smith, Allen Noble, and Harriet Hardiston testified that the defendant had made in their presence threats that he would kill the deceased, similar to that made in the presence of Ulm.

Jackson Marshall says in his testimony that about 3 or 4 o'clock in the evening of the day of the killing, he met the defendant near his house with a gun, who went into witness's house out of a rain, and fearing the powder may have become wet, he stepped out of the house and fired off his gun, and went into the house again, where he reloaded the gun with slugs and shot; the defendant then left his house and went in the direction of the railroad; about an hour after defendant left witness's house, he heard a gun fire in the direction of the spot where the body of the deceased was found; the report was like that of the gun fired by defendant outside of his door; saw the dead body, and the slugs and shot after they were taken out of the wound; these seemed to be the same sort with which the defendant loaded his gun at his house; witness knew defendant's gun, and said the one in court was the same.

Martha Paul testified that she saw the defendant in the evening of the killing standing under the bridge over the railroad with a gun; she asked him what he was doing there, and he said to her that he was "hunting rabbits;" witness went directly home, and was but a very short time in getting there, and just as she got home, she heard a gun fire in the direction she had come; said that defendant had a little short gun like that exhibited in court.

Jacob Black testified that he was with the deceased at Newman's store at nearly dark on the day he was killed; that it was about a half mile from Newman's store to the place of killing; that the dirt road crosses the railroad on a bridge near the spot; on his way home the deceased would have to cross the bridge; it is something less than a half mile from the bridge to the point where the body was found; from the latter place one could see a person crossing the bridge; there is a deep cut in the direction

of the bridge; a man pursuing the dirt road would come very suddenly upon one at the place of killing.

John Hardiston testified that defendant said that he had loaded his gun with slugs and shot, and that he saw Mr. Newman take slugs and shot out of the wound; that the defendant said that he did shoot off his gun, but that he shot at a rabbit, and if he killed Jerry Miller he did not know it.

Moses Kelly testified that when he got to the graveyard everybody was there but the defendant, and he was going in an opposite direction from the burial ground, but turned and went with the witness and others to the graveyard, and there said that his gun was loaded with slugs and shot, which he shot at a rabbit down on the road, and if he killed Jerry Miller he did not know it; heard the defendant ask Ann Miller "Where were you last night that you let them get my breeches?" she said that she had gone to her sister-in-law's; he then said that is damnation to me; if it had not been for you, I should not have been in this trouble.

James A. Newman in his testimony says that the gun in court is the same that was got at defendant's; and Mr. Dart testified that defendant lived on his place; that there is a cut at the point where the body was found, which would prevent a person on the railroad from seeing one on the dirt road, nor could one on the latter see another upon the former; the locality is favorable for the concealment of one contemplating crime; at the place where the body was found one could easily see another riding across the bridge; at the spot where the body was found the two roads run parallel, the railroad running through a cut; the bank there is about four feet high.

The previous threats, the antecedent grudge, and lying in wait with a gun loaded with slugs, are evidences of malice and of a deadly purpose, and together with the other circumstances detailed in the evidence, point to the plaintiff in error as the guilty agent, and establish his guilt beyond a reasonable doubt. For circumstantial evidence, to be sufficient for conviction, should tend to exclude every other supposition inconsistent with the defendant's guilt; but it need not necessarily be such as to show it to be *impossible* that any other person could have committed

the crime. There is nothing in the three first assignments of error to justify this court in reversing the judgment in this case.

This brings us to the fourth assignment of error, which presents the question whether it is necessary, in passing sentence of death, that the court should previously ask the prisoner if he has anything to say why judgment should not be pronounced against him. This is the first time, so far as we know, that this question has been presented for the adjudication of this court.

This seems to be required by the highest authorities, such as Hale, Hawkins, Blackstone, Chitty, and Archbold, and the absence of which was ruled, in Rex v. Geary, 2 Salk., 630, and King v. Speke, 3 Salk., 358, to be fatal. And we find it contained in all the books of entries and forms, so far as we have been able to examine them. As these forms of records are deeply seated in the foundations of the law, and as they conduce to safety and certainty, they surely ought not to be disregarded when the life or liberty of a human being is in question.

In the above cited case of The King v. Geary, in 2 Salkeld, Geary was attainted of high treason, on an indictment to which he pleaded not guilty. Upon a writ of error brought to reverse the attainder, the exception was taken, that it did not appear from the record that he was asked what he had to say why judgment should not be given against him. And the court held the exception good; for he might have a pardon or other matter to move in arrest of judgment. And in New York, in the case of Safford v. The People, 1 Parker's Cr. Cases, 476, the court say: "By the record, as certified to us, it does not appear that the court demanded of the defendant what he had to say why judgment should not be pronounced against him. This undoubtedly was necessary; and it seems, it must appear by the record to have been done." And this is recognized by the court in New Jersey, in the case of West v. The State, 2 Zabriskie, 222, as the correct doctrine; as also in the state of Georgia, in the case of Grady v. The State, 11 Georgia, 257. And it has been held in Pennsylvania, that upon a conviction for murder in the first degree, it should appear from the record that the prisoner was present in court

when he was sentenced to be executed, and that he was asked if he had anything to say why sentence of death should not be pronounced upon him. Hamilton alias Thacker v. Commonwealth, 4 Harris, 129. And so in Alabama, in the case of Perry v. The State, 43 Ala., 22. This principle of law has its foundation in good sense and common justice, and applies in all capital cases.

Mr. Bishop, in a thorough examination of the English and American doctrine upon this subject, says: "It is now indispensably necessary, even in clergyable felonies, that the defendant should be asked by the court, if he has anything to say why judgment of death should not be pronounced on him; and it is material that this appear upon the record to have been done; and its omission will be a sufficient ground for reversal of the judgment. On this occasion he may allege any ground in arrest of judgment; or plead a pardon, if he has obtained one. If he has nothing to urge in bar, he may address the court in mitigation of his conduct, or cast himself upon their mercy." 1 Bishop's Cr. Pr., sec. 865.

Blackstone says: "When upon a capital charge, the jury have brought in their verdict guilty, in the presence of the prisoner, he is either immediately, or at a convenient time soon after, asked by the court if he has anything to offer why judgment should not be awarded against him." 4 Comm., 375. And in the appendix to that volume, he has given a record of an indictment and conviction of murder, which might aid clerks in making up such records, if they were disposed to read it and avail themselves of it.

For the reason, that it does not appear from the record that the plaintiff in error was asked by the court if he had anything to say why judgment of death should not be pronounced on him, the judgment will be reversed, and the cause remanded for the further action of the court below, in accordance with this opinion. The verdict stands as it is.